SWEENEY *et al. v.* THOMPSON *et al.*

*(Circuit Court, E. D. Louisiana.* June 24, 1889.)

1. GENERAL AVERAGE—BOND—SEAWORTHINESS OF VESSEL.

In a libel on a general average bond, the evidence of libelant was that the steam-boat ran over some concealed obstruction which carried away her wheel, and broke her rudders and shaft, so that she became helpless, and had to be towed to a port, put in dry-dock, and repaired. The respondents contended that the steam-boat was unseaworthy at the time of the disaster, and the inquiry was confined to the question whether or not the shaft of the steam-boat was seaworthy. The evidence of the engineer, firemen, second mate, and master and others, who were on duty, was that the steamer collided with some unknown obstruction, and this was corroborated by persons who examined her after she was in dry-dock, and found bruises on her hull. Respondent's witnesses testified that they had examined the boat, and found no bruises on the hull, but there was no direct testimony contradicting the engineer, fireman, master, and others. *Held,* that the preponderance of evidence was in favor of libelant.

**2. SAME—EVIDENCE OF SEAWORTHINESS.**

The shaft, when it broke, gave way suddenly, as if from a sudden application of exterior force, and it appeared that when it broke the iron was fibrous, showed no crystalization, and had the appearance of a sudden break, rather than that of a slow and gradual giving way. The proof was that, when a shaft gives way from natural wear, the process is gradual, and shows itself on the outside by a crack, and by the working loose of the wedges which tighten the flanges around the shaft, and that notice of such giving way is always conveyed to the engineer and master by a wabbling of the wheel affecting the machinery. An inspection of the boat shortly before the accident showed no signs of defect, and the wedges had not worked loose, and there was no wabbling of the wheel. It was conceded that the shaft had a welding defect at the place of fracture, but the testimony showed that the solid part of the shaft at the point of fracture had two and one-half times the strength required for balancing the strain required of it to perform its work. *Held*, that the evidence showed that the shaft was seaworthy.

**3. SAME—BASIS OF AVERAGE.**

The evidence showed that the steam-boat had lost her motive power, and was in a leaky condition, not in any port or harbor, and could only reship, if at all, on transient boats. *Held*, that ship and cargo were in peril, and the expense of towing her to port formed the basis of a general average.

**4. SAME.**

The fact that the port of refuge and the port of destination were the same makes no difference.

In Admiralty. Libel on a general average bond. On appeal from dirtrict court.

*W. W. Howe* and *J. R. Beckwith*, for libelants.

*Percy Roberts*, for respondents.

PARDEE, J. The libel in this case is one *in personam* on a general average bond. Among the suitable allegations to such suit, the libel propounds that—

"Soon after, said steam-boat proceeded on her voyage to New Orleans with said cotton and other lots of cotton and cargo aboard, when afterwards, on the 12th of February, 1888, in coming out of Old river, her usual and proper course, she suddenly ran over some unknown obstruction or object concealed beneath the water in the usual channel, which carried away her wheel, and broke the rudders, beside doing serious damage to her machinery, and causing her hull to leak very badly, and she was left in a disabled and helpless condition; that it became necessary, in order to save said steam-boat and her cargo from total loss and destruction, to have her towed to New Orleans by another steam-boat, the John H. Hanna, a distance of some —— miles, and said steam-boat Corona was leaking so badly that it was absolutely necessary to keep all the boat's pumps at work from the time of the accident until her cargo was discharged and she was placed in the dry-dock for necessary repairs."

The answer admits a large portion of the facts propounded in the libel to be true. As to others, it neither admits nor denies, for want of information on the subject, but requests full and legal proof thereof, and then denies liability because of the said average bond, or for any other cause growing out of the facts alleged in said libel—

"For the causes and reasons following, to-wit: That said steamer Corona at the time she received the said cotton of respondents on board, and during her said subsequent voyage, was not staunch and strong, and was not in condition to safely receive and transport said cotton, as was implied in holding herself out as a common carrier, and so receiving said cotton for carriage,

but, on the contrary, that the said steamer was, when she received said cotton and during her said subsequent voyage, in an unseaworthy condition; and that her said disabled condition, and the said alleged necessity of being towed to the port of New Orleans, and all of the alleged costs, expenses, and sacrifices, were caused by the unseaworthy condition of the steamer, and particularly by the fact that the shaft of the engine of said steamer was defective, and wholly insufficient to withstand the labor and strain devolving upon it in the ordinary course of the voyage she was then engaged in,—thereby rendering said steamer unseaworthy, and liable for all the costs, expenses, and sacrifices alleged in said libel."

The issue thus made by the libel and answer is as to the seaworthiness of the Corona at the time of the disaster alleged. To this issue the evidence in the case has been wholly directed, and on it the case has been tried in the district court, and argued in this court; and not only has the issue up to this time been confined to the question of seaworthiness, but it has been particularly confined to the single question as to whether or not the shaft of the Corona was seaworthy. In the briefs filed in the case, one or two other questions affecting the liability of the defendants have been suggested and argued.

On the question of seaworthiness, the following facts appear from the evidence:

*First.* That at the time of the disaster by which the Corona lost her wheel the boat collided with some unknown obstruction in the river. This appears by the evidence of the engineer, fireman, second mate, and master, all on duty at the time, and by the evidence of the carpenter, stevedore, and mate, officers of the boat, who were observers of the disaster. It is not opposed by any evidence on the part of any person on the boat; it is only contradicted by theories and experiences of experts. The fact is corroborated by the independent fact shown by the testimony of several witnesses, who examined the vessel after going into the dry-dock with regard to the injuries the hull of the boat received. From two of these witnesses I quote:

Oris I. McClellan says he is in the dry-dock business. Has been for the last 13 years. His dock is the Ocean dry-dock, in which the Corona was placed after the accident under investigation. "Examined her after she was in the dock. On her starboard bow there was a mark of bruises, as if she had been struck by some object that extended several feet in the back from the bow, and it was a large spot, I should judge about three feet square, and there was a little break away from it running under the boat. One of the balance rudders—the balance part of the rudder—was broken in the end, and split up to such an extent that it necessitated the putting in of a new piece, and the strengthening of the stock. This rudder extends forward under the stern of the boat, forward of the wheel. It was that part of the rudder which would naturally be struck by any object that struck the bow of the boat, and run under the boat." In concluding his testimony he says:

"I should infer she struck some object in the river, which struck her in the bow, glanced under her, then struck the rudder, then rose up and tore this wheel out, catching on the shaft of the wheel, and tore it out. I should judge

it came up between the hull of the boat and the wheel. When it got from underneath the boat, its buoyancy naturally got it up under the wheel, and broke it off."

Victor Junior swears that he is foreman of the Ocean dry-dock. Has been in the business for 14 years. He examined the Corona when it was placed in the dock. Says:

"All the marks that I saw on the Corona when she came in were on the starboard side. We were on the deck of the dock, and when she came up out of the water far enough we saw it, and it was bruised. It looked at first like a scratch, but when it got up it was a great bruise on the starboard side. One of her rudders was damaged."

There are three other witnesses who testify for the libelants that the bruises on the Corona (as sworn to by McClellan and Junior) existed as claimed.

The respondent produces four witnesses, who testify that they examined the hull of the Corona when she was in the dry-dock, and found no evidence of any late bruises or collision on the hull, but none of them swear as to injury to the rudder.

In the record is the report of a survey on the Corona, held on February 16th, after the accident, at New Orleans, by D. H. Connors, then inspector for the New Orleans Board of Underwriters, and O. F. Vallette, ship-builder, in which it is certified as follows: "After careful examination, we find the shaft broken, cylinder timbers, plumber-blocks, and cams and rudder on port side broken, and when in dock we found four planks on starboard side forward broken." Some weight must be given to this certificate, although Connors' evidence in the record is not very satisfactory as to any actual examination made by him, and Octave Vallette (presumably the ship-builder O. F. Vallette) is one of the four witnesses of the respondent testifying that on examination of the Corona in dock they found no evidence of any late bruises or collision. Connors, in his original examination as a witness, testifies to marks and bruises on the hull, and to the removal of three or four planks, but said: "There were no marks of an impact with anything." When recalled, he testified that the broken planks and the pieces thereof showed evidence of a collision, and to the question, "Could you observe on the bottom of that boat, taking into consideration these bruised planks, anything else that the boat had gone over some obstruction of some kind?" answered, "Well, yes; there was a crease as if she had passed diagonally across to port."

Considering all the evidence on the matter of bruises on the hull of the Corona in its bearing on the question of collision by the Corona with some obstruction at the time of the accident, the preponderance is largely on the side of the libelants. As a general rule, witnesses who do see outweigh witnesses who do not see. It was impossible, it seems to me, for Mr. McClellan and his foreman to be mistaken, under the circumstances, in a matter of this kind.

*Second.* The shaft of the Corona when it broke gave way suddenly, as if from a sudden application of exterior force. It appears that where

the shaft broke the iron was fibrous, showed no crystalization, and had the appearance of a sudden break, rather than that of a slow and gradual· giving way.    The proof is that, where a shaft gives way from natural wear and giving out, the process is gradual, and invariably shows itself on the outside by a crack, and by the working loose of the wedges which tighten the flanges around the shaft.    The evidence also shows that notice of such gradual giving way of a shaft is always conveyed to the engineer and master by a wabbling or irregular motion of the wheel affecting the machinery.    So far as this particular shaft was concerned, the evidence is to the effect that an inspection shortly before showed no signs whatever of defect; that the wedges had not worked loose; and that no notice whatever was given to the engineer of any deflection in the shaft by any wabbling of the wheel or peculiarity in the engines.    To this showing on the part of the libelants the respondents have naught to offer but the theory and experience of alleged experts.

*Third.*  While it is a conceded fact that in the shaft of the Corona there was a welding defect at the place of the fracture, yet it is mathematically established in the case that, notwithstanding this welding defect, the solid part of the shaft, which was suddenly broken at the time her wheel was lost, at the point of fracture had nearly two and a half times the strength required by well-recognized formulæ for balancing the computed torsion and strain required of it to perform its ordinary duty in the navigation of the Corona.    In this the mechanical engineers, who have testified in the case on both sides, substantially agree.    Upon these facts, the conclusion is inevitable that the shaft of the Corona at the time of the disaster in question was seaworthy; that is, was sufficiently staunch and strong to withstand the ordinary perils of navigation.    There is in the case a field for conjecture well opened up by the testimony of experts, and by the learned and ingenious argument of proctor for respondents. However, it is a field in which no certainty is to be attained, and into which the court does not feel called to enter.    The whole case depends entirely upon the construction and effect to be given to the evidence. The district judge considered it, and seems to have had no difficulty in determining in favor of fact, as against the argumentative case presented by the respondent.    His conclusion and judgment are entitled to great weight.

Since the original submission of the case, the pleadings have been somewhat amended, new evidence taken, and it is now claimed that, if the court shall find that the Corona was seaworthy, yet the libelants ought not to recover, because, although the disaster was caused by a collision with some obstruction in the river, yet, as the leaks of the Corona were soon under control, and the boat itself was brought to shore and tied up, the cargo was in no danger, and could easily have been reshipped, and that, therefore, the towing expenses of the ship and cargo to New Orleans could not be the basis of a general average.    I have read the additional evidence, and have examined the numerous cases cited in the briefs, and have consulted the text-books; and, considering it all, I have no trouble in concluding, on the case as made by the evidence

herein, that as the Corona had entirely lost her motive power, and was in a leaky condition, not in any port or harbor of refuge, and could only reship, if at all, on transient boats, as a whole, ship and cargo were in peril, and extraordinary services and expenditures were necessary for the common safety of ship and cargo; and as these services were rendered, and these expenditures were made, the case is properly one of general average. That the port of refuge and the port of destination were the same makes no material difference. Where it is possible to save the ship as well as the cargo, it is doubtful if the master should be criticised for not separating them, even if he have an opportunity. If he does separate them under such circumstances, the ship does not thereby lose her claim for general average. In the present case the evidence does not show that any reshipment ought to have been made, or could have been made without largely increased expenses. Let a decree be entered for the libelants as prayed for in the libel.